977 F.2d 141
 141 L.R.R.M. (BNA) 2409, 61 USLW 2283,
123 Lab.Cas. P 10,396
 AMF BOWLING COMPANY, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
AMF BOWLING COMPANY, INCORPORATED, Respondent.
DISTRICT 4, UNITED STEELWORKERS OF AMERICA, AFL-CIO, CLC, Petitioner,
v.
AMF BOWLING COMPANY, INCORPORATED; National Labor Relations
Board, Respondents.
 Nos. 91-2553, 91-2596 and 91-2597.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 6, 1992.
Decided Oct. 5, 1992.
 
 R. Daniel Bordoni, Bond, Schoeneck & King, Syracuse, N.Y., argued (W. Carter Younger, McGuire, Woods, Battle & Boothe, Richmond, Va., on brief), for petitioner.
 James R. LaVaute, Blitman & King, Syracuse, N.Y., Joseph A. Oertel, N.L.R.B., Washington, D.C., argued (Jerry M. Hunter, Gen. Counsel, D. Randall Frye, Acting Deputy Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, on brief), for respondent.
 Before SPROUSE and NIEMEYER, Circuit Judges, and KIDD, Senior United States District Judge for the Northern District of West Virginia, sitting by designation.
 OPINION
 SPROUSE, Circuit Judge:
 
 
 1
 AMF Bowling Company petitions for a review of a decision and order of the National Labor Relations Board, which found that it had violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act[1] during negotiations over a collective bargaining agreement with District 4, United Steel Workers of America, AFL-CIO, CLC, the representative of employees at AMF's plant in Lowville, New York. The Union challenges an NLRB finding that AMF did not violate the Act by pursuing to impasse a proposal to allow without limitation nonUnion personnel to perform Union work. The Board applies for enforcement of its order.
 
 
 2
 * AMF, headquartered in Richmond, Virginia, is a manufacturer and seller of bowling lanes and bowling equipment with plants located in Lowville, New York, and Shelby, Ohio. In August 1986, a group of private investors from Richmond agreed to purchase AMF from Minstar, Inc. After purchasing AMF, the investors swiftly cut AMF's expenses by $10 million and laid off 172 salaried employees who were not covered by the collective bargaining agreement with the Union. The existing collective bargaining agreement governing seventy-five production and maintenance employees at the Lowville plant was scheduled to terminate on December 8, 1986, in the midst of the cost-cutting. Accordingly, AMF and the Union agreed to bargain over a successor agreement.
 
 
 3
 Bargaining began on December 3, 1986, five days before the collective bargaining agreement expiration date. The central dispute during this negotiating session concerned the hourly wages for Union employees. Under the old collective bargaining agreement, AMF paid Union employees an average wage of $9.00 per hour. During the negotiations, the Union initially insisted upon a wage increase of 6-8% per year, while AMF demanded a wage cut of 24-26%. In support of its demand for wage concessions, AMF claimed that the wages of employees at the Lowville plant were much higher than wages for comparable jobs in the area. AMF also pointed out that the manufacturing division had lost over $7 million in 1986, and it noted that employees at the Shelby plant had recently accepted a 24% wage cut.
 
 
 4
 In response to AMF's demand, the Union stated that it would not accept a wage cut unless AMF justified its wage proposal by opening its books and showing an inability to pay wage increases. AMF demurred, responding that it was not claiming an inability to pay wage increases. The parties were unable to reach a new agreement at the first negotiating session. Consequently, they agreed to extend the terms of the current contract until January 8, 1987. A second, unsuccessful bargaining session was held on December 16, 1986.
 
 
 5
 At the third bargaining session on January 6, 1987, AMF raised another issue relevant to this appeal. Under the existing agreement, non-bargaining unit employees could perform unit work only to experiment with new equipment or new methods, to train employees, to assist when machines malfunctioned, to manufacture prototypes and experimental models, and when there was excessive absenteeism.[2] AMF, however, insisted during the negotiations on including a clause in the new collective bargaining agreement that would allow nonUnion workers to perform Union jobs without limitation.
 
 
 6
 Two more unsuccessful sessions were held the following days, January 7 and 8, 1987. Although both sides arguably moderated their demands, the negotiators were again unable to reach an agreement. On the evening of January 8, the Union membership met and voted to reject AMF's offer. They voted against striking and authorized their negotiators to seek an extension of the existing contract. AMF, however, refused to extend the contract.
 
 
 7
 Further bargaining sessions were held on January 14 and 15. After the latest attempt at negotiation failed, AMF notified the Union on January 16 that the negotiations had reached an impasse, both with regard to the economic proposals and with regard to the unit-work proposal. On January 21, the day after Union membership rejected AMF's latest proposal, AMF unilaterally implemented changes in the employees' wages and benefits. Another unsuccessful bargaining session was held on January 27.
 
 
 8
 On March 4, the Union requested another meeting. John Burtch, AMF's principal negotiator, rejected the request, stating, "Unless the Union's position has altered dramatically, further meetings would ... be futile." Some time later, the Union presented AMF with a new counterproposal. At a final meeting on April 30, 1987, Burtch acknowledged that the Union's counterproposal was closer to the mark but stated, nevertheless, that the Union had "wasted his time." Several days later, sixty-nine of the seventy-five unit employees told AMF that they no longer wished to be represented by the Union. AMF then withdrew recognition of the Union and unilaterally implemented further changes in the terms and conditions of employment.
 
 
 9
 Once the AMF employees stated they no longer wished to be represented by the Union, AMF revised its policy manual to extend to these employees the personnel policies that covered the Company's non-bargaining unit employees. Among these policies was a severance pay plan. AMF's General Manager, Rodney Mallette, testified that, in extending the plan to former bargaining unit members, he inadvertently failed to delete the reference to non-bargaining unit employees. Therefore, the Company's manual stated: "Any employee is eligible for a severance allowance if he/she is involuntarily terminated by the Company, unless he/she ... [i]s a member of a bargaining unit."
 
 
 10
 Another factual circumstance important to the issues on appeal relates to a wage chart. The matter of the chart had surfaced earlier. Some time in December 1986, during the early stages of the negotiations, AMF's president, Frank Genovese, had compiled a one-page chart comparing wage increases at the Lowville plant over the preceding fourteen years to increases in the Consumer Price Index, to wage indices for Virginia and North Carolina workers, and to the wage index for the entire United States. According to Genovese, he compiled the chart in late December to test his belief that wage increases at the Lowville plant had exceeded both the rate of inflation and the increase in wages realized by other employees in the woodworking industry.
 
 
 11
 The Union filed an unfair labor practice charge with the NLRB on January 22, 1987. On September 16, 1987, the NLRB's General Counsel issued a complaint against AMF, charging that it had violated sections 8(a)(1) and 8(a)(5) of the NLRA by engaging in surface bargaining with the Union rather than bargaining in good faith; by failing to give a "reasonable explanation" for cutting wages and benefits; by failing to give a reasonable explanation for its stance on non-economic issues, such as its demand to have non-unit employees perform unit work; and by unilaterally implementing changes in the terms of employment of Union employees despite the absence of a valid impasse. On September 21, 1987, the Union filed additional unfair labor charges with the NLRB, charging that AMF had violated section 8(a)(5) by withdrawing recognition of the Union, negotiating directly with unit employees, and refusing to provide relevant information requested by the Union.
 
 
 12
 After a hearing, an administrative law judge concluded that AMF's declaration of impasse on the economic package was invalid. It based this conclusion on two independent findings. First, the ALJ found that AMF's overall conduct leading up to the impasse, including its failure to produce the wage chart, amounted to bad-faith surface bargaining. Second, even if AMF had bargained in good faith, the impasse was invalid because it was premature, i.e., negotiations were not actually deadlocked. Because the impasse was invalid, the ALJ found that the following four post-impasse actions by AMF violated sections 8(a)(1) and 8(a)(5) of the NLRA: AMF (1) withdrew recognition of the Union, (2) unilaterally changed the terms and conditions of unit employee work, (3) formed and encouraged employee grievance committees, and (4) failed to provide the Union with requested pension plan information. In addition to these violations, the ALJ found that AMF's general bad-faith bargaining constituted an unfair labor practice.
 
 
 13
 The ALJ also found invalid AMF's declaration of impasse on its proposal to permit non-unit employees to perform bargaining unit work without limitation. It held that AMF committed a per se violation of the NLRA by pursuing this proposal to impasse, because it was in effect a proposal to alter the bargaining unit.
 
 
 14
 In its review of the ALJ's decision, the NLRB agreed that the impasse on the economic package was invalid. In reaching this conclusion the Board reviewed only one element of AMF's pre-impasse conduct: its failure to provide the wage chart to the Union. The Board held that this failure was a specific act of bad-faith bargaining in violation of section 8(a)(5); therefore, the subsequent impasse was invalid. The Board did not review either the ALJ's finding that AMF engaged in bad-faith bargaining generally, or his finding that AMF's declaration of impasse was premature. Because the Board agreed with the ALJ that the impasse on the economic package was invalid, it affirmed the ALJ's findings that AMF committed four post-impasse unfair labor practices: withdrawing recognition of the Union, making unilateral changes in the collective bargaining agreement, dealing directly with unit employees, and failing to provide pension plan information. AMF's refusal to bargain unless the Union's position "altered dramatically" and Burtch's comment at the final bargaining session that the Union had "wasted his time," were also found to be violations of section 8(a)(5). All of these conclusions were predicated on the finding that the impasse on the economic package was invalid.
 
 
 15
 On non-economic issues, the Board found that AMF violated section 8(a)(1) by precluding bargaining unit employees from participating in its severance plan, but it dismissed the separate charge regarding AMF's proposal to allow without limitation non-unit employees to perform unit work. The Board held that the language in AMF's employee manual concerning the severance plan was impermissibly discriminatory against Union employees. On the unit-work proposal, it disagreed with the ALJ's finding that the proposal altered the description of the bargaining unit; the Board found that the proposal merely concerned work assignments.
 
 
 16
 The NLRB's order required AMF, among other things, to bargain in good faith with the Union, restore all terms and conditions of employment provided by the expired contract, reimburse unit employees for any lost wages or benefits, furnish the Union with the wage chart, and eliminate from its employee manual any language indicating that bargaining unit employees were excluded from participating in its severance benefits plan.
 
 
 17
 AMF appeals the NLRB's holding that it violated section 8(a)(5) of the Act by failing to provide the wage chart. It argues further that because its failure to provide the chart was not an act of bad-faith bargaining, its declaration of impasse on the economic package was valid. Therefore, it contends the Board's holding that AMF committed six post-impasse violations must be reversed. It also appeals the Board's finding that AMF violated section 8(a)(1) by precluding unit employees from participating in the severance plan. The Union appeals the NLRB's holding that AMF did not violate the Act by pursuing to impasse its proposal to allow without limitation non-unit employees to perform unit work. The Board seeks enforcement of its order. Because it is not directly related to the other findings, we consider first the section 8(a)(1) claim with regard to the severance plan. We then address the Board's interrelated findings regarding the section 8(a)(5) claims: AMF's failure to provide the wage chart and the six unfair labor practices found by the Board to have flowed from that failure, and AMF's insistence on the unit work proposal.
 
 II
 
 18
 A. Section 8(a)(1) Violation The Severance Plan
 
 
 19
 Section 8(a)(1) of the NLRA makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees, in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a)(1). Section 7 of the Act grants employees "the right to self-organization, to form, join, or assist labor organizations." Id. § 157. In NLRB v. Rubatex Corp., 601 F.2d 147 (4th Cir.), cert. denied, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979), we held that an employer violated section 8(a)(1) by awarding a bonus to union workers who worked during a strike. In so holding, we noted that "the grant of special benefits to union members who have chosen not to strike unlawfully interferes with the right of those and other employees to strike in the future," id. at 150, because it " 'clearly demonstrated for the future the special rewards which lie in store for employees who choose to refrain from protected strike activity,' " id. (quoting Aero-Motive Mfg. Co., 195 NLRB 790, 792 (1972), enf'd, 475 F.2d 27 (6th Cir.1973)). In EPE, Inc. v. NLRB, 845 F.2d 483, 491-92 (4th Cir.1988), we upheld a finding by the NLRB that a company violates section 8(a)(1) when it tells employees that they will not be eligible for certain benefits if they become union members.
 
 
 20
 AMF's employee manual states that "[a]ny employee is eligible for a severance allowance if he/she is involuntarily terminated by the Company, unless he/she ... [i]s a member of a bargaining unit." AMF contends that the manual's reference to the severance allowance did not violate the NLRA for two reasons: it was merely the result of an editing error, and AMF and its employees understood that the severance plan applied to both Union and nonUnion workers.
 
 
 21
 Accepting this representation, we nevertheless conclude that the NLRB properly found that a violation had occurred. The manual language unambiguously informs employees that they will lose severance benefits if they join a union. The NLRB properly remedied this error by simply ordering AMF to remove the statement from the manual.B. Section 8(a)(5) Violation The Wage Chart
 
 1.
 
 22
 Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The general duty to bargain also includes the obligation to provide information to a negotiating counterpart under certain circumstances. In NLRB v. Truitt Mfg. Co., 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027 (1956), the Supreme Court stated that "[g]ood-faith bargaining necessarily requires that claims made by either bargainer should be honest claims.... If ... an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy." Id. at 152-53, 76 S.Ct. at 755-56. Therefore, "[i]t is well established that § 8(a)(5) requires an employer to supply information relevant to the bargaining issues if requested to do so by the union." NLRB v. Beverage-Air Co., 402 F.2d 411, 413 (4th Cir.1968). Whether a request is sufficiently specific to notify the other party that designated information is required must be determined by factual inquiry. Truitt, 351 U.S. at 153, 76 S.Ct. at 756.
 
 
 23
 In Rubatex this court enforced an NLRB finding that an employer violated section 8(a)(5) by failing to provide the union with information about bonuses paid to employees who worked during a strike. Rubatex, 601 F.2d at 150-51. At a meeting between the company and the union, after the strike had ended and a new collective bargaining agreement had been executed, the union requested information about bonuses that the company had paid to employees who worked during the strike. Specifically, the union requested how the bonuses were computed and questioned the legality of the practice. The company said it would "check into the payments" but never responded. In affirming the Board's holding that the failure to disclose information with regard to the bonuses constituted an unfair labor practice, we stated, "Although other subjects were discussed at the meeting, we think that this exchange gave Rubatex sufficient notice that the union desired information concerning the bonus. Nor was the union obligated to repeat its request." Id. at 151.
 
 
 24
 In Washington Materials Inc. v. NLRB, 803 F.2d 1333 (4th Cir.1986), we affirmed an NLRB decision that four companies committed unfair labor practices by failing to furnish information on double-breasting, i.e., the practice by unionized businesses of conducting nonunion business on the side. During several meetings the union specifically alleged that four companies owned nonunion businesses; stated that it would make the companies an offer they could not refuse if the companies would discuss their relationships with nonunion businesses; and requested several times to look at their books, explaining that this would prove that some of the companies were subsidizing nonunion operations. We upheld the Board's conclusion that the companies had committed unfair labor practices by failing to furnish the requested information. Id. at 1339; see also General Electric Co. v. NLRB, 414 F.2d 918, 925 (4th Cir.1969) (holding that employer committed an unfair labor practice by failing to disclose results of survey of wages paid by other employers in the area in response to request by union), cert. denied, 396 U.S. 1005, 90 S.Ct. 557, 24 L.Ed.2d 496 (1970).
 
 
 25
 In the case before us, the Union, unlike the unions in Rubatex, Washington Materials, and General Electric, did not ask the employer for the document at issue. AMF was very clear throughout the negotiations in stating its position that the wages at Lowville were higher than wages elsewhere. The Union concedes that it did not explicitly ask for the wage chart. Nor did it explicitly request any information in support of AMF's claim that the wages at Lowville were abnormally high. Rather, the Union's theory is that its request for AMF to open its books and to justify its position gave AMF sufficient notice that it sought any documentation in support of AMF's request for wage concessions. We are unpersuaded. As we have indicated, our inquiry here is fact-specific. There is no evidence that the Union disbelieved AMF's claim that wages at Lowville were above market, or that it disputed AMF's point that the company's previous owners had recently negotiated a collective bargaining agreement with the Shelby workers in which they agreed to a twenty-four percent wage cut. We are simply unpersuaded that the Union's general request put AMF on notice that the Union sought the wage chart. We therefore reverse the Board's ruling on this issue.
 
 2.
 
 26
 Although we hold that AMF's failure to produce the wage chart did not constitute an unfair labor practice, we are unable to conclude that AMF's declaration of impasse on the economic package was valid, because, in its total reliance on the wage chart circumstances, the Board left open other matters raised by the ALJ's decision. The Board did not review the ALJ's determination that the impasse resulted from general bad-faith bargaining and that it was prematurely declared.
 
 
 27
 As to the first issue, whether AMF engaged in general bad-faith bargaining leading up to the impasse, the ALJ found that while the Union bargained reasonably and remained flexible, AMF deliberately delayed submitting wage proposals; deliberately withheld wage information during the January 7 bargaining session; proposed greater wage cuts as bargaining continued, while the Union reduced its wage demands; failed to "provide economic justification for [its] regressive bargaining position"; did not give the Union sufficient time to evaluate its January 7 and January 14 proposals; and declared an impasse (and unilaterally implemented its proposals) only ten days after it became "prepared to intelligently bargain" and only nine days after it submitted its first comprehensive wage proposal. The ALJ found that AMF's post-impasse conduct also evidenced general bad-faith bargaining. He based this conclusion on his findings that at the April 30 bargaining session AMF's principal negotiator told the Union that it had "wasted his time," when in fact the Union had agreed to "major concessions" while AMF had "demanded nothing less than full capitulation to [AMF]'s January 14 proposals;" and that employees received certain benefits directly from AMF, which had said, while at the bargaining table, that it could not provide those benefits. See also NLRB v. Insurance Agents' Int'l Union, 361 U.S. 477, 485, 80 S.Ct. 419, 425, 4 L.Ed.2d 454 (1960); Allbritton Communications Co. v. NLRB, 766 F.2d 812, 822-23 (3d Cir.1985), cert. denied, 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 891 (1986); NLRB v. A-1 King Size Sandwiches, Inc., 732 F.2d 872, 877 (11th Cir.), cert. denied, 469 U.S. 1035, 105 S.Ct. 508, 83 L.Ed.2d 399 (1984); Weirton Steel, Div. of Nat'l Steel Corp. v. NLRB, 689 F.2d 504, 507 (4th Cir.1982).
 
 
 28
 Finding AMF's declaration of impasse to be premature, the ALJ concluded that
 
 
 29
 impasse was never reached between the parties, and at no time was collective bargaining sufficiently exhausted.
 
 
 30
 The Union at all negotiations indicated it's [sic] willingness to be flexible.... [AMF made regressive demands and] was rushing to declare impasse, orally stating the parties were at impasse on January 8, only two days after it made its first complete written proposal.
 
 
 31
 See also Excavation-Constr., Inc. v. NLRB, 660 F.2d 1015, 1020 (4th Cir.1981); American Fed. of Television & Radio Artists v. NLRB, 395 F.2d 622, 628 (D.C.Cir.1968).
 
 
 32
 On remand, the Board should consider these two issues developed by the ALJ. If on either basis it finds that the impasse on the economic package was invalid, it may, of course, reconsider whether AMF's post-impasse conduct violated the Act.
 
 
 33
 C. Section 8(a)(5) Violation The Unit-Work Proposal
 
 
 34
 Although we reverse the Board's holding that AMF's declared impasse on the economic package was invalid, we affirm its ruling that AMF could declare a bargaining impasse on its proposal to allow non-unit employees to perform unit work without limitation.
 
 
 35
 The distinction between mandatory subjects, which the parties may pursue to impasse, and permissive subjects, which may be negotiated but cannot be used to justify a refusal to reach an agreement, is rooted in the definition of "collective bargaining" contained in section 8(d) of the NLRA. See 29 U.S.C. § 158(d). Section 8(d) defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." The duty to bargain collectively is limited to the subjects delineated within section 8(d), and "within that area neither party is legally obligated to yield." Fibreboard Corp. v. NLRB, 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). "As to other matters, however, each party is free to bargain or not to bargain, and to agree or not to agree." Wooster Div. of Borg-Warner Corp. v. NLRB, 356 U.S. 342, 349, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). Therefore, "it is lawful to insist upon matters within the scope of mandatory bargaining and unlawful to insist upon [permissive] matters...." Id.
 
 
 36
 The Union argues that AMF's unit-work proposal altered the description of the bargaining unit. Such a proposal is a permissive subject of bargaining. Newport News Shipbuilding & Dry Dock Co. v. NLRB, 602 F.2d 73, 76 (4th Cir.1979). Therefore, AMF committed an unfair labor practice by pursuing the proposal to impasse. AMF contends that its proposal did not alter the description of the bargaining unit; rather, it concerned the assignment of work to unit and non-unit employees. Because a work assignment affects wages, hours, and conditions of employment, it is a mandatory subject of bargaining. Fibreboard Corp., 379 U.S. at 215, 85 S.Ct. at 405; Local 666 v. NLRB, 904 F.2d 47, 51 (D.C.Cir.1990); NLRB v. Plymouth Stamping Div., Eltec Corp., 870 F.2d 1112, 1116 (6th Cir.), cert. denied, 493 U.S. 891, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989); NLRB v. Westinghouse Broadcasting & Cable, Inc., 849 F.2d 15, 22 (1st Cir.1988). Therefore, AMF argues, it did not commit an unfair labor practice by pursuing its proposal to impasse.
 
 
 37
 In our view, AMF's contention that its proposal had the potential to affect wages, hours, and conditions of employment, and was therefore a mandatory subject of bargaining, is correct. The Union's argument that the proposal relates only to the scope of the bargaining unit is simply not persuasive. The purpose of the proposal was to permit other workers to use equipment operated by Union members. This proposal had the potential to reduce the amount of work done by Union hands, as well as the dollars put in Union pockets. It further created the possibility that Union members would be required to work alongside and share equipment with nonUnion workers. The proposal did not create any dispute over who did or did not belong to the bargaining unit, who was or was not covered by the collective bargaining agreement. The issue here is a straightforward section 8(d) issue--whether Union workers will have to share their work with nonUnion members. Compare Local 666, 904 F.2d at 52 (holding that employer's proposal affected work assignments, not the scope of the bargaining unit, because it "merely affected what jobs the unit members could perform, not who qualified as unit members") with Newport News Shipbuilding, 602 F.2d at 78 (holding that employer's proposal to change bargaining unit definition from "designers" to "draftsmen" would not merely affect work assignments but would alter the scope of the bargaining unit, because it would "not only modify the job functions of the various unit members but also affect their right to representation").
 
 
 38
 We therefore agree with the Board that this issue was a mandatory subject of bargaining falling within the scope of section 8(d), and that AMF could pursue the proposal to impasse. As the Board correctly noted, however, the question of good faith could here too be an overriding consideration. On remand, the Board's views on this issue may be affected by its review of the ALJ's finding that AMF engaged in general bad-faith bargaining.III
 
 
 39
 In sum, we reverse the Board's holding that AMF's refusal to produce the wage chart constituted an unfair labor practice. Its decision with regard to the wage chart was the sole underpinning for its finding that AMF's declaration of impasse on the economic package was the result of bad-faith bargaining so we likewise reverse the Board's ruling that the impasse was invalid. Because its ruling on the invalidity of the impasse underpinned its finding that AMF committed the six unfair labor practices described supra, we also reverse its ruling on these issues. We affirm, however, the Board's holding with respect to the severance plan and its holding that AMF could bargain to impasse on its proposal to allow non-unit employees to perform unit work.
 
 
 40
 Regarding the impasse on the economic package, the ALJ found that AMF engaged in a general pattern of surface bargaining and that its declaration of impasse was premature, and therefore that the impasse was invalid. The Board did not consider these findings. On remand the Board should determine, in light of our opinion, whether AMF's overall behavior during the negotiations leading to the impasse on economic package constituted general bad-faith bargaining and whether AMF's declaration of impasse was premature. The Board, of course, is also free to determine whether AMF's overall behavior during the negotiations leading to the impasse on the unit-work proposal constituted bad-faith bargaining.
 
 
 41
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 
 
 [1]
 29 U.S.C. §§ 158(a)(1) and 158(a)(5)
 
 
 [2]
 The old collective bargaining agreement had provided:
 It is understood that "non-bargaining personnel" may perform the work ordinarily performed by the Employees covered by this Agreement under the following conditions:
 1) To experiment with equipment, machinery parts, material or products or with new methods of performing the operation.
 2) To train new Employees or to give old Employees additional instructions.
 3) To assist on jobs or operations where machinery malfunctions occur.
 4) To manufacture and assemble prototype and experimental models.
 5) To perform the work of an Employee where there is excessive absenteeism and such work is necessary, provided there are no other Employees available to do the work.