63 F.3d 1293
 150 L.R.R.M. (BNA) 2134, 64 USLW 2192,
130 Lab.Cas. P 11,404
 AMF BOWLING COMPANY, INCORPORATED, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
District 4, United Steelworkers of America, AFL-CIO, CLC,
Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
AMF BOWLING COMPANY, INCORPORATED, Respondent.
 Nos. 94-2150, 94-2256.
 United States Court of Appeals,
Fourth Circuit.
 Argued April 3, 1995.
Decided Aug. 29, 1995.
 
 ARGUED: R. Daniel Bordoni, Bond, Schoeneck & King, L.L.P., Syracuse, NY, for petitioner. David S. Habenstreit, N.L.R.B., Washington, DC, for respondent. James R. LaVaute, Blitman & King, Syracuse, NY, for intervenor. ON BRIEF: W. Carter Younger, McGuire, Woods, Battle & Boothe, Richmond, VA, for petitioner. Frederick L. Feinstein, Gen. Counsel, Linda Sher, Acting Associate Gen. Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, Linda Dreeben, Supervisory Atty., N.L.R.B., Washington, DC, for respondent.
 Before NIEMEYER and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 The petition for review is granted and the cross-petition for enforcement is denied by published opinion. Judge NIEMEYER wrote the opinion, in which Judge HAMILTON joined. Senior Judge BUTZNER wrote a dissenting opinion.
 OPINION
 NIEMEYER, Circuit Judge:
 
 
 1
 When AMF Bowling Company, Incorporated, failed to obtain wage concessions at its Lowville, New York, plant through bargaining with the United Steelworkers of America AFL-CIO, CLC, District 4, it declared an impasse and unilaterally implemented its last wage offer. Thereafter, when the employees voted that they no longer wished to be represented by the Steelworkers, AMF withdrew recognition of the Union. On the Union's charges of unfair labor practices, the NLRB found that, although AMF bargained in good faith, its declaration of an impasse was premature. Accordingly, the Board concluded that AMF's subsequent acts violated sections 8(a)(5) and (1) of the National Labor Relations Act.
 
 
 2
 Because we conclude that the Board failed to recognize that the parties had reached a valid impasse, we grant AMF's petition for review and deny the Board's cross-petition to enforce its order.
 
 
 3
 * Minstar, Inc. sold its AMF Bowling Division to private investors in August 1986. The division, which became AMF Bowling Company, Incorporated, manufactured bowling pins and lanes at its plant in Lowville, New York, and related equipment at its plant in Shelby, Ohio. After taking over AMF in November 1986, the new owners sought to reverse $7 million in losses suffered in 1986 at the two plants and to make the company competitive. They cut expenses by $10 million and laid off 172 salaried non-bargaining unit employees. A few months before selling the Bowling Division of AMF, Minstar had successfully negotiated a 24% wage cut and 14% benefit cut for the employees at the Shelby plant. The new owners likewise sought to reduce the labor costs fixed by the collective bargaining agreement with the union employees at the Lowville plant, whose wages exceeded those in the relevant job market. With the collective bargaining agreement governing those wages scheduled to expire on December 8, 1986, the new owners believed that the Lowville employees should bear their share of cost reductions.
 
 
 4
 AMF's objectives for negotiations with the Lowville employees were to reduce the weighted average wage from $9.00 per hour to a level between $7.50 and $8.00 per hour, and to reduce the cost of benefits. With the Shelby agreement in mind, the new owners expected that the Union would agree to some wage concessions, reducing AMF's existing labor expenses.
 
 
 5
 Shortly before the new owners took over AMF, the Union notified the company that it was terminating the existing collective bargaining agreement, which expired December 8, 1986, and was requesting bargaining on a new agreement. And after the new owners took over, the Union's negotiator informally introduced himself to bargaining representatives of the new owners and expressed the hope that the deep cuts agreed to by the parties at the Shelby plant would not be sought at the Lowville plant.
 
 
 6
 In addition to various informal telephone discussions, the parties conducted seven formal negotiating sessions in December 1986 and January 1987--on December 3 and 16, 1986, and January 6, 7, 8, 14, and 15, 1987. When the parties adjourned on January 15 with AMF's final wage offer on the table but with no agreement that further bargaining would take place, AMF sent the Union a telegram dated January 16 declaring an impasse:
 
 
 7
 EFFECTIVE AT MIDNIGHT TUESDAY, JANUARY 20 1987 THE FINAL OFFER WHICH WAS PRESENTED TO THE STEELWORKERS ON JANUARY 14 1987 EXPIRES. UNLESS THE UNION AGREES TO BREAK THE IMPASSE EXISTING BETWEEN THE PARTIES AND ACCEPT AMF'S FINAL CONTRACT PROPOSAL PRIOR TO MIDNIGHT JANUARY 20 1987 AMF BOWLING AT THAT TIME WILL IMPLEMENT THE WAGES AND BENEFITS PRESENTED ON JANUARY 14 1987.
 
 
 8
 On January 20, 1987, the Lowville employees voted unanimously to reject AMF's final offer, first made on January 14, and the next day AMF implemented that proposal.
 
 
 9
 The impasse declared by AMF was based on the parties' alleged inability to agree on any wage concessions, i.e. a reduction in the average wage rates. The positions taken by the parties throughout the negotiating sessions on this issue are essentially uncontroverted.
 
 
 10
 At the first session on December 3, the Union proposed a two-year agreement with 8% wage increases each year and increased benefits. AMF responded that it was a new and smaller company that needed to be more competitive and therefore would be seeking wage and benefit cuts. The Union countered by demanding that the company open its books if it was going to seek wage cuts. AMF explained that it was not claiming an inability to pay, which would have triggered the Union's right to review the books. Rather, the company claimed that the wages it was then paying were too high and had to be cut for the company to become competitive. At this session, the parties agreed to extend the existing collective bargaining agreement, which was set to expire on December 8, for an additional month until January 8, 1987, to allow additional time for bargaining.
 
 
 11
 At the next bargaining session on December 16, AMF presented the general proposal that had been agreed to at the Shelby plant, which involved a 24% wage reduction and a 14% cut in benefits. The Union responded that if the company wanted wage cuts, it would have to open its books and "prove" that it needed the wage cuts. AMF explained that it was not "pleading poverty," but rather was seeking to pay market-rate wages. The Union responded that it would reduce its proposal from an 8% increase the first year to a 6% increase and suggested that the parties consider profit sharing.
 
 
 12
 The third bargaining session took place on January 6, 1987, when the company repeated that it needed wage concessions, arguing that cuts had already been made elsewhere throughout the company. The Union responded that the Lowville plant should not be responsible for mismanagement in other parts of the company. The Union representative then added, "I've talked to our people in Pittsburgh and we are not authorized to engage in any concessionary bargaining unless the company opens up its books.... [W]e're not entertaining concessions unless you open up the books." The discussions then turned to non-economic proposals.
 
 
 13
 Bargaining resumed the next day on January 7, and the company presented its first specific wage proposal representing a weighted average wage rate of $6.72 per hour, which represented significant wage cuts. The Union responded that it would consider accepting some proposed benefit reductions if AMF would reconsider its demand for wage reductions. The Union indicated that it would agree to no less than a wage freeze for the first year of a new contract and an increase of 3% in the second year. When AMF repeated its need for wage concessions, the Union reiterated that it would not accept anything below current wages in the first year. It also repeated its demand to see the company's books.
 
 
 14
 Bargaining continued at the session on January 8, during which the Union repeated that "wages would remain the same ... we are not addressing wage decreases." AMF nevertheless left the Union with a two-year proposal that included a weighted hourly wage of $7.10 per hour. The Union did not make a counterproposal; rather, its representative indicated that since the contract was ending that day, the Union would vote on what AMF had presented.
 
 
 15
 That evening, the Union voted unanimously to reject AMF's proposals, but they also voted against striking. Thereafter, the Union requested a further extension of the existing collective bargaining agreement, a request which AMF denied.
 
 
 16
 After a cooling-off period proposed by the federal mediator, bargaining resumed on January 14, 1987. At that meeting the Union stated that it "can't move on wages.... [F]rom the very beginning we made it perfectly clear that we were not even going to take any concessions. We need to have that wage freeze the first year." Without any movement from the Union, AMF submitted its second increase and its last offer, increasing its weighted wage offering from $7.10 to $7.34 per hour with a 3% increase in the second year. The Union continued to state that a wage freeze with a 3% increase in the second year was the lowest it would go.
 
 
 17
 The last bargaining session before AMF declared an impasse was held on January 15, 1987. Before that meeting, the federal mediator privately advised AMF of his understanding that the Union had "a dollar to give." At the session on January 15, therefore, AMF sought to elicit that concession by asking whether there were any noneconomic concessions it could make in exchange for a wage cut. The meeting recessed without any agreement or movement on the wage concessions, and no future bargaining sessions were scheduled.
 
 
 18
 The next day, January 16, AMF sent a telegram to the Union stating that unless it agreed to break the impasse before midnight on January 20, AMF would implement the last offer it made to the Union. The Union responded that same day, accusing AMF of unlawfully refusing to open its books and declaring that there was no good faith impasse. The Union indicated that it was ready to meet with AMF at any time. Four days later, on January 20, the Union submitted AMF's latest proposal to its membership, and the membership unanimously rejected the offer. The next day, the company implemented this latest offer.
 
 
 19
 The parties met twice thereafter to reopen the bargaining, but without success. On May 28, 1987, bargaining-unit employees at Lowville presented AMF with a petition signed by approximately 70% of their members, stating, "We do not want the United Steelworkers of America to represent us at AMF Lowville plant anymore." AMF thereafter withdrew recognition of the Union.
 
 II
 
 20
 On January 22, 1987, one day after AMF implemented its last offer of $7.34 per hour, the Union filed an unfair labor practice charge against AMF with the National Labor Relations Board. The Union contended that AMF committed unfair labor practices by refusing to permit the Union to examine the company's financial records, refusing to bargain in good faith, engaging in "surface bargaining," unilaterally changing wages and other terms and conditions of employment without reaching a good faith impasse, and advising employees that if they rejected the company's last contract proposal they would be without union representation. The Regional Director filed a complaint, based on these charges, on September 16, 1987, alleging that AMF had violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(5), (1).
 
 
 21
 Several months after filing its first charge, on September 21, 1987, the Union filed another charge alleging that AMF committed an unfair labor practice by withdrawing recognition of the Union and refusing to meet and bargain in good faith. This charge was amended on September 28, 1987, to add allegations that AMF unilaterally changed the terms and conditions of employment and dealt directly with the employees. The Regional Director filed a second complaint against AMF, consolidated it with the first complaint, and scheduled a hearing. Following a lengthy trial, the Administrative Law Judge (ALJ) concluded that AMF's conduct "establishe[d] conclusively an attempt by the new owners to rid itself [sic] of the Union which had been the collective bargaining representative of the unit employees for over 20 years." The ALJ found that AMF's refusal to provide wage surveys and information to justify its proposals in time for the Union to evaluate such proposals constituted evidence of bad faith. He also found AMF's declaration of impasse to be premature and to evidence bad faith bargaining. The ALJ concluded:
 
 
 22
 Based on Respondent's proposals, and its actions and conduct at the bargaining table alone, I conclude Respondent bargained in bad faith with no intention of reaching an agreement with the Union.... In view of Respondent's bad-faith bargaining I find that no impasse can be reached. Oak Rubber Co., 277 N.L.R.B. 1322, 1985 WL 46151 (1985).
 
 
 23
 Reviewing the ALJ's opinion, the NLRB agreed that the impasse on the economic package was invalid because AMF refused to provide a wage chart to the Union to justify the company's demand for wage concessions. The Board concluded that this refusal was a specific act of bad faith bargaining in violation of Sec. 8(a)(5) and therefore that the subsequent impasse was not in good faith because it resulted from bad faith bargaining. The Board did not review either the ALJ's findings that AMF engaged in bad faith bargaining generally or that AMF's declaration of an impasse was premature. A.M.F. Bowling Co., 303 N.L.R.B. 167, 1991 WL 135220 (1991).
 
 
 24
 On appeal to this court, we rejected the premise of the Board's holding that bad faith bargaining could be predicated on AMF's refusal to produce a wage chart when one was never specifically requested. We concluded additionally that there was no evidence in the record "that the Union disbelieved AMF's claim that wages at Lowville were above market, or that it disputed AMF's point that the company's previous owners had recently negotiated a collective bargaining agreement with the Shelby workers in which they agreed to a twenty-four percent wage cut." AMF Bowling Co. v. NLRB, 977 F.2d 141, 147 (4th Cir.1992) (" AMF I "). We therefore reversed the Board and remanded the case to the Board to determine (1) whether AMF's overall behavior during the negotiations leading to the impasse on the economic package constituted general bad faith bargaining, and (2) whether AMF's declaration of an impasse was premature. Id. at 149.
 
 
 25
 On remand, the Board reviewed the record in detail, analyzing each act of bad faith attributable to AMF, and concluded that the Union had failed to demonstrate any evidence of bad faith on the part of AMF. A.M.F. Bowling Co., 314 N.L.R.B. No. 160, slip op. at 9, 1994 WL 478490 (Aug. 31, 1994). On the contrary, the Board observed that AMF responded promptly to the Union's request for bargaining and acted reasonably in meeting with the Union on seven occasions during December 1986 and January 1987. In addition, the Board noted that there were both private telephone calls and conference calls between the parties. The Board stated that there was no evidence that AMF "refused to conduct negotiations in a 'business-like manner.' " Id. In summarizing its conclusions about AMF's conduct throughout the negotiations, the Board concluded:
 
 
 26
 [W]e disagree with the [administrative law] judge's finding that the Respondent engaged in a campaign to undermine the Union. Examining the Respondent's conduct prior to its declaration of impasse on January 16, there is no evidence of animus or pre-impasse conduct away from the bargaining table establishing an intent by the Respondent to frustrate agreement.
 
 
 27
 * * *
 
 
 28
 [W]e do not agree with the judge that the Respondent has demonstrated the kind of intransigence and insistence on its own proposals that evidences bad faith. Accordingly, we reverse the judge's finding that the Respondent violated Section 8(a)(5) and (1) of the Act by bargaining in bad faith prior to its declaration of impasse.
 
 
 29
 Id. at 9-10.
 
 
 30
 Pointing to movement by the Union on benefits issues prior to January 16, 1987, the Board concluded that, even though the evidence indicated that the Union would not consider any wage concessions unless AMF opened its books, the Union's flexibility on benefits revealed that its demands for AMF's financial records did not impose "immutable barriers" to agreement. Id. at 11. The Board also recited the federal mediator's comment to the effect that the Union had authority to agree to a $1.00 per hour wage cut. Id. Based on this evidence, the Board adhered to its earlier position that AMF's declaration of an impasse was premature. Id. Accordingly, it found that the acts taken by AMF in reliance on its declaration of impasse violated Sec. 8(a)(5) and (1) of the Act. Id. at 11-12.
 
 
 31
 In its petition for review of this last Board decision, AMF contends that the Board's conclusion that the impasse was premature is not supported by the record. Therefore, AMF maintains that the violations of the Act, which were premised upon an invalid declaration of impasse, must be reversed. The Board filed a cross-petition to enforce its order. We are thus presented with the issue of whether the record supports the Board's conclusion that AMF's declaration of impasse was premature.
 
 III
 
 32
 Section 8(a)(5) of the National Labor Relations Act makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. Sec. 158(a)(5). Defining the obligation "to bargain collectively," section 8(d) of the Act requires, among other things, that the employer and employees "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment ... but such obligation does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. Sec. 158(d). See generally NLRB v. American National Insurance Co., 343 U.S. 395, 72 S.Ct. 824, 96 L.Ed. 1027 (1952). Because the duty to bargain does not impose an obligation to agree, at some point during bargaining a party can conclude that further meetings and discussions will not produce an agreement and can declare that an impasse has been reached. If the party declaring an impasse does so in good faith and its conclusion is justified by objectively established facts, then the duty to bargain is satisfied. See Laborers Health and Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 544 n.5, 108 S.Ct. 830, 833 n.5, 98 L.Ed.2d 936 (1988). When the parties are thus without a collective bargaining agreement, having made good faith efforts to reach one, the employer may impose its own terms and conditions of employment unilaterally. See id. On the other hand, if the employer declares an impasse prematurely or in bad faith, the employer thereby fails to satisfy the duty to bargain and exposes itself to the charge that it committed an unfair labor practice in violation of sections 8(a)(5) and (1) of the Act.
 
 
 33
 Against this doctrinal framework, we address the question of whether AMF improperly refused to bargain when it declared an impasse on January 16, 1987, and thereafter unilaterally implemented its last offer.
 
 IV
 
 34
 Bearing significantly on our analysis in this case is the Board's finding that AMF bargained in good faith before it declared an impasse. This good-faith finding is a powerful fact in favor of AMF, a fact from which we may infer that AMF made a bona fide effort to reach agreement prior to January 16, that it was honest in its negotiating positions, and that it did not act out of any motive contrary to its stated desire to negotiate a new contract, such as a desire to undermine the Union or the negotiations. We should therefore consider the validity of the impasse declared in the light of the Board's conclusion that AMF was bargaining in good faith.
 
 
 35
 The impasse declared by AMF was defined by the company's expressed need for wage concessions to remain competitive and by the Union's refusal to discuss wage concessions. It was clear from the historical context--heightened competition in the industry, past year losses, company restructuring, the above-market rates at Lowville, and the collective bargaining agreement in Shelby, Ohio--that AMF's sole objective was to reduce its labor costs at the Lowville plant. AMF expressed this objective to the Union at the parties' first introduction. Understandably, forestalling any wage reduction became the Union's primary concern. This issue was thus framed at the first negotiating session, and it remained the principal impediment to agreement thereafter.
 
 
 36
 Whether out of an honest conviction or simply as a negotiating tactic, the Union stated that (1) it would not discuss wage concessions unless the company opened its books, and, moreover, (2) it was unauthorized by "Pittsburgh" to discuss wage concession without reviewing the company's books. Even though the demand to review the books was later recognized to be an improper one, it nevertheless formed the basis for the Union's refusal to discuss wage concessions. It is uncontested that the Union never discussed a wage concession of any amount, nor did it ever expressly suggest to AMF that this topic was open for discussion.
 
 
 37
 Against these uncontroverted facts, the Union points to its movement on non-wage issues and on wage increases during the bargaining sessions as evidence that an impasse had not been reached. Indeed, it was this movement that formed the basis for the Board's conclusion that bargaining had not been exhausted when AMF declared an impasse. When, however, we examine the facts with an eye to the parties' positions on the critical wage-concession issue, the only conclusion that can be reached is that the parties were hopelessly deadlocked on January 15, 1987.
 
 
 38
 AMF's opening request to the Union on December 3, 1986, was that the Union agree to match the 24% wage concession that the bargaining unit at the Shelby plant had accepted. In its first specific wage proposal, presented on January 6, 1987, AMF offered an average weighted wage of $6.72 per hour. On January 7, it offered $7.15. Finally, without any Union movement on wage concessions, AMF offered $7.34 on January 14. The Union voted twice to reject the offers, but it never made a counterproposal to move from its position that it would not discuss any wage concession.
 
 
 39
 Even though the Union moved from its initial position demanding an 8% wage increase for the first year to one demanding a 6% increase, it never wavered from its opposition to ever granting a wage concession, i.e. a wage reduction. At most, it would agree to a wage freeze. Moreover, the Union never gave any indication that it would so much as discuss a wage concession. At the first session, the Union stated that it did not have authority to negotiate a concession without reviewing AMF's books, and it reiterated this position every time wages were discussed. The Union representative made this point explicit, stating, "if you're going to seek wage cuts, we want you to open your books to us." Indeed, the first unfair labor practice charge filed with the NLRB after AMF implemented its final wage offer was based on AMF's refusal to permit the Union "to examine its financial records." When AMF bid against itself, increasing its offer twice without any indication from the Union that it would agree to a wage concession, it concluded that its third bid would be its final one. When AMF announced its final position, the Union responded on January 20, voting to reject AMF's final offer without submitting any counterproposal.
 
 
 40
 The only fact in the record weighing in the Union's favor is the federal mediator's communication to AMF relating his understanding that the Union negotiating committee was authorized to accept a $1.00 wage cut. In order to elicit movement in view of this possibility and, indeed, to determine whether the Union in fact had such authority, AMF thereafter inquired whether there were any non-economic proposals it could accept to entice the Union to agree to a wage cut. When the Union failed to respond, the company sent the Union a telegram indicating that AMF's last offer of January 14 was its final one and that it believed the parties had reached an impasse. Rather than countering in a manner suggesting to AMF that the Union might be willing to move on a wage concession, the Union voted unanimously on January 20 to reject the company's January 14 offer. On January 21, the day after the vote, the company unilaterally implemented its final offer.
 
 
 41
 Against this factual background in which the Union continually reinforced its unwillingness to discuss wage concessions with the assertion that wage concessions were beyond the local's negotiating authority, we must conclude that AMF's declaration of an impasse after three wage bids without a counterproposal for a wage cut was objectively reasonable. The validity of the impasse is further confirmed by the Union's improper demand to view the company's books as a condition to any movement on the wage concession issue. Indeed, AMF's failure to acquiesce to this demand formed the basis for the Union's first unfair labor charge. That claim, however, was dismissed by the Regional Director and never pursued further. See Concrete Pipe & Products Corp., 305 N.L.R.B. 152, 1991 WL 203809 (1991), enf'd sub nom. United Steelworkers of America v. NLRB, 983 F.2d 240 (D.C.Cir.1993). Instead, the Union pursued a claim that AMF illegally withheld a market wage data chart it had prepared. Therefore, the Union contended that its firm position was justified, as AMF's refusal to provide the chart revealed bad faith. In AMF I, however, we rejected that claim and remanded the case to determine whether any other aspect of bargaining justified a finding of bad faith or whether the impasse was valid. See AMF I, 977 F.2d at 146-47.
 
 
 42
 In summary, in the context of (1) the Board's finding that AMF bargained in good faith; (2) the unjustified refusal on the part of the Union to discuss wage concessions; and (3) three company bids for successively smaller wage cuts without any movement on the wage-concession issue by the Union, we conclude that AMF properly declared an impasse and that, after the Union voted down AMF's final proposal, AMF properly implemented the terms and conditions included in its last offer. In reaching a contrary conclusion, the Board misunderstood the requirements for finding a premature impasse and failed to follow its holding in Concrete Pipe and Products Corp.
 
 
 43
 An impasse is that point in negotiations when the parties, in good faith, are entitled to conclude that further bargaining would be futile. See E.I. DuPont DeNemours & Co., 268 N.L.R.B. 1075, 1984 WL 36073 (1984); Pillowtex Corp., 241 N.L.R.B. 40, 46, 1979 WL 9593 (1979), enf'd, 615 F.2d 917 (5th Cir.1980). The judgment of whether further negotiations would be futile must be viewed from the vantage point of the parties at the time they believed an impasse was reached. See Excavation-Construction, Inc. v. NLRB, 660 F.2d 1015, 1020 (4th Cir.1981). An impasse is not demonstrated simply when one party's concessions are not thought to be adequate or when frustration in the movement in negotiations has reached a subjectively intolerable level. The policy of the National Labor Relations Act is to encourage negotiation and to give the bargaining process a chance to work, even if the chance for success is remote. See NLRB v. Plymouth Stamping Div., Eltec Corp., 870 F.2d 1112, 1117 n.2 (6th Cir.), cert. denied, 493 U.S. 891, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989).
 
 
 44
 The parties, however, need not pursue negotiations simply to go through the motions when there is no objectively reasonable hope of reaching an agreement. While the Act encourages agreement, it does not require it; any agreement must be the product of the parties' free will exercised in furtherance of their good faith interests. Moreover, bad faith is not evidenced by a failure to reach agreement or by a failure to yield to a position fairly maintained. See United Steelworkers of America v. NLRB, 983 F.2d 240, 245 (D.C.Cir.1993). Since the Act imposes only a duty to bargain, see 29 U.S.C. Secs. 158(a)(5) & (d), that duty may be satisfied when the parties in good faith reach a point in their discussions where further meetings and discussions objectively appear to be futile.
 
 
 45
 The inquiry into whether the parties reached a good faith impasse is often factual, and when it is, we defer to the Board. See 29 U.S.C. Sec. 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). In this case, however, the facts are not in dispute. Moreover, it is particularly significant to our analysis that the Board has removed, through its findings, the possibility that the company's negotiating positions were pretextual for some unstated motive and found, on the contrary, that the company conducted its negotiations in good faith. While the Board noted movement in the discussions, from which it concluded that the declaration of an impasse was premature, it relied on movement on collateral issues which could not overcome the fundamental disagreement on wage concessions that actually formed the basis for the impasse. The Board did not focus on the evidence in the record relating to negotiations on a wage concession, which was the principal objective of the company and the point on which the Union would not yield. Indeed, the company made an effort to strip away all other issues, by conceding them, and to isolate the one overarching dispute about a wage concession to determine whether there was any possibility that the Union would eventually accept a concession. The record, without exception, reveals that the Union never gave AMF any hope that the barrier to wage cuts could be overcome by further bargaining. AMF had moved from wage offers of $6.72 per hour to $7.15 per hour to $7.34 per hour, without any Union counterproposal for a wage cut. Without any Union movement on a wage cut in response to the company's three separate proposals--each more beneficial to the Union than the preceding--we find it objectively reasonable for AMF to have concluded that further bids would fail to elicit any wage cut proposal from the Union. Not only did the Union fail to manifest any hope of movement, it conveyed the message that the local's negotiating committee was without authority even to negotiate on wage concessions.
 
 
 46
 In affirming AMF's declaration of an impasse, we do not rely solely on the lack of movement by one party. It is also important that the Union's stated reason for refusing to discuss wage cuts was an improper one. From the outset, beginning at the December 3 bargaining session, the Union stated that it would not discuss wage cuts unless the company opened its books. Later, it also stated that "Pittsburgh" gave that same reason for directing the local to refuse to discuss wages. Yet, it is uncontested that AMF never pleaded poverty or claimed an inability to pay current or even higher wages. Rather, AMF stated that wages currently paid were above those paid in the relevant job market, that the Shelby plant had agreed to reduce labor costs, and that the company needed similar concessions at the Lowville plant to remain competitive. In light of the company's stated reasons for seeking wage concessions, its financial records were irrelevant.
 
 
 47
 The Board's recent decision in Concrete Pipe and Products Corp., 305 N.L.R.B. 152, 1991 WL 203809 (1991), enf'd sub nom. United Steelworkers of America v. NLRB, 983 F.2d 240 (D.C.Cir.1993), provides strong support for the principle that a union's unfailing insistence on economic data, when the union has no right to that data, may give rise to an objectively reasonable declaration of impasse. In Concrete Pipe, the company sought wage concessions of approximately 33% and reductions in benefits of approximately 50% to maintain its competitiveness. The company stated simply that "to be competitive, wage rates and benefits must be lowered." 305 N.L.R.B. at 152. The company did not claim that it could not afford the current wages or that it was at risk of closing down. The Union requested economic information to justify the company's position on wage cuts and would not agree to any concessions "without access to the company's financial records." Id. at 153. The Board concluded that an impasse had been reached and that the company was thereafter entitled to implement unilaterally its final proposals. The Board rejected the claims that the company negotiated in bad faith and prematurely declared an impasse. Id. at 153-54. We believe that the circumstances in Concrete Pipe are persuasively analogous to those before us.
 
 
 48
 Accordingly, we conclude that the Board erred in failing to recognize that the basis for AMF's declaration of an impasse was the Union's lack of movement on wage concessions and the absence of any indication by the Union that a wage reduction might be forthcoming through further bargaining. Since all of the alleged unfair labor practices at issue flowed from the Board's conclusion that AMF's declaration of an impasse was premature, we grant AMF's petition for review and deny the Board's cross-petition to enforce its order.
 
 
 49
 IT IS SO ORDERED.
 
 BUTZNER, Senior Circuit Judge, dissenting:
 
 50
 The Board relied on the following facts to support its conclusion that there was no valid impasse when the company implemented the economic terms of its January 14 offer. See AMF Bowling Co., 314 NLRB 969, 978-79, 147 LRRM 1250, 1259-61, 1994 WL 478490 (1994).
 
 
 51
 * Although the parties met seven times in December and January, the company presented only a general economic proposal on December 16. At that time, the company negotiator had not yet become familiar with the existing contract.
 
 
 52
 * The various economic proposals that the company presented on January 7, 8, and 14 differed from the existing wage and grade classification system. These proposals also differed from each other with respect to the number of job grades, the classifications in each grade, and the wage rates in each grade.
 
 
 53
 * The union demonstrated flexibility. It moved from requesting an eight percent increase to a six percent increase.
 
 
 54
 * The union stated that it would consider benefit reductions if the company would reconsider its demand for reduced wages.
 
 
 55
 * The union also proposed a bifurcated wage structure involving a wage freeze for current employees and a wage reduction for new hires. Later it offered to accept a wage freeze and to move on economic benefits if the company would agree to the retention of the union security clause.
 
 
 56
 * On January 8, the union agreed to accept the company's benefit package in exchange for a first-year wage freeze in lieu of cuts.
 
 
 57
 * The union also raised the possibility of implementing a profit sharing program.
 
 
 58
 * The company unjustifiably did not explore the union's offers to discuss potential tradeoffs for wage reductions.
 
 
 59
 * On January 15, the union did not indicate that no further concessions could be expected.
 
 
 60
 * By January 15, the company had not yet furnished requested information regarding its pension and health insurance plans.
 
 
 61
 * The company also had failed to furnish information about job classifications that the company had eliminated.
 
 
 62
 * The company refused without explanation to consider profit sharing.
 
 
 63
 * The company also failed to settle the duration of the contract that it proposed, and this omission precluded final resolution of the company's economic package.
 
 
 64
 * With respect to the company's final offer of January 14, the union was trying to determine how the new classifications in the proposal would affect benefits and other terms and conditions of employment, such as bumping and bidding rights.
 
 
 65
 * Further bargaining was required to provide the union a basis for understanding the new classifications.
 
 
 66
 * On January 14, the mediator told the company that the union was prepared to take a wage cut of a dollar an hour.
 
 
 67
 * On January 16, the company declared an impasse, and on January 21, it implemented the provisions of its January 14 offer.
 
 
 68
 The Board's factual findings are supported by substantial evidence on the record as a whole. Consequently, they are conclusive. 29 U.S.C. Sec. 160(e). Universal Camera Corp. v. NLRB, 340 U.S. 474, 477, 488, 71 S.Ct. 456, 459, 464, 95 L.Ed. 456 (1951). The Board's conclusions of law should be accepted whenever "its construction of the statute is reasonably defensible." Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).
 
 
 69
 A party can declare an impasse and implement unilateral terms of employment only if there is "no realistic prospect that continuation of discussion would [be] fruitful." NLRB v. WPIX, Inc., 906 F.2d 898, 901 (2d Cir.1990) (internal quotation marks and citation omitted). To insure the integrity of collective bargaining, proof of an impasse must be clear. Bolton-Emerson, Inc. v. NLRB, 899 F.2d 104, 108 (1st Cir.1990).
 
 
 70
 Deciding whether an impasse exists requires assessment of the facts and complexities of the bargaining process, a function especially dependent on the Board's expertise. "Few issues are less suited to appellate judicial appraisal than evaluation of bargaining processes or better suited to the expert experience of a Board [that] deals constantly with such problems." Bolton-Emerson, Inc., 899 F.2d at 108; see NLRB v. Plainville Ready Mix Concrete Co., 44 F.3d 1320, 1326 (6th Cir.1995). Speaking in the context of multi-employer bargaining, the Supreme Court observed in a statement that is applicable to the controversy before us that "assessing the significance of impasse and the dynamics of collective bargaining is precisely the kind of judgment that ... should be left to the Board." Charles D. Bonanno Linen Service v. NLRB, 454 U.S. 404, 413, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982).
 
 
 71
 Cases upholding the Board's decisions about impasses are legion. Most are fact bound, but in each are found the governing principles that I have cited. Perhaps for our purposes the most fitting illustration of proper appellate review is found in an opinion that Judge Haynsworth wrote for our court. In that case after extended bargaining and mutual suspension of negotiations, the union requested resumption of meetings in a letter to the company, making some substantial concessions, but saying nothing about its adamant demand for a check-off. The company rejected the request for a meeting. The Board faulted the company. Referring to the company's argument that the Board could not have reasonably expected the company to accept the union's modified proposal in view of the union's failure to suggest any concession in its demand for a check-off, the court stated:
 
 
 72
 This, we think, is beside the point. When the union tendered some concessions, the employer might reasonably be required to recognize that negotiating sessions might produce other or more extended concessions. That is the purpose of collective bargaining. By July, it was readily apparent to the union that the impasse could be broken only by concessions on its part, but it would be extraordinary to suppose that it would do so then in terms of an ultimatum, or that its initial modification of its demands would go to the ultimate limits of its possible agreement.
 
 
 73
 Since the union's concessions in July 1964 cannot be said to have been trivial or meaningless, we think it was for the Board to say whether or not they were of such substantiality as to relieve the impasse and to open a ray of hope with a real potentiality for agreement if explored in good faith in bargaining sessions.
 
 
 74
 NLRB v. Webb Furniture Corp., 366 F.2d 314, 316 (4th Cir.1966). While not exact, the resemblance to the case before us is striking. As the Board pointed out, the union made substantial concessions. Specifically, the union's position about accepting a significant cut in pay that the mediator conveyed to the company "opened a ray of hope" concerning the possibility of reaching an agreement.
 
 
 75
 One other point deserves mention. The company relies heavily on Concrete Pipe and Products Corp. v. NLRB, 305 NLRB 152, 1991 WL 203809 (1991), enf'd sub nom. United Steelworkers v. NLRB, 983 F.2d 240 (D.C.Cir.1993). That case bears many similarities to the case before us, but on the most critical aspect, the cases differ, as the Board pointed out. In Concrete Pipe the union unjustifiably refused to discuss wage reduction unless the company opened its books. The company declared an impasse, and both the Board and the reviewing court upheld the declaration. Ironically, the cornerstone of the reviewing court's decision was the deference due the Board on the issue of impasse. The court said with respect to the union's arguments against finding an impasse: "We do not find these arguments weighty enough to overcome the deference we give Board determinations concerning impasse." 983 F.2d at 246. The company's brief, although pressing the court's opinion in Concrete Pipe upon us, does not deign to quote this passage.
 
 
 76
 In the case before us, the union also unjustifiably demanded examination of the company's books when the company had not pled inability to pay. But in contrast to the situation in Concrete Pipe, the Board found that the demands for financial information were not "immutable barriers to the union's agreement to make concessions." 314 NLRB at 979, 147 LRRM at 1261. This finding is amply supported by the evidence. The union made significant wage concessions for new hires, and it retreated from its demand for a pay increase to a pay freeze depending on modification of the company's noneconomic proposals. And significantly, the mediator advised the company on January 14 that the union was prepared to take a wage cut of a dollar. The Board noted that the company negotiators were annoyed that on January 15 the union did not actually make such an offer. Nevertheless, in the words of the Board, "it was not clear that further bargaining would be futile, i.e., that the Union would make no further movement on items important to the Respondent and that the parties had exhausted the prospects of concluding an agreement." (internal quotation marks and citation omitted). 314 NLRB at 979, 147 LRRM at 1261.
 
 
 77
 The Board's comment is particularly telling because of the short time the parties bargained before the company declared an impasse. Although nominally the bargaining extended over a period of about 30 days, realistically it did not get underway until January 7. The company declared the impasse nine days later on January 16, after only four substantial bargaining sessions.
 
 
 78
 Considering the evidence that undergirds the Board's decision, and according the Board the deference that is due in matters of this nature, I am persuaded that substantial evidence supports the Board. Because the company's declaration of an impasse was premature, its subsequent refusal to bargain and unilateral implementation of terms and conditions of employment violated the Act. Dissenting, I would enforce the Board's order.